Good morning. Good morning. May it please the court Tanya Sander on behalf of appellants, the Tongass Conservation Society and others. I'd like to reserve five minutes of my time this morning for rebuttal, please. There are three issues that I'm going to focus on this morning. First, contrary to the National Environmental Policy Act, and Ninth Circuit precedent, the Forest Service failed to respond to leading scientist concerns over wolf mortality in the project area of the Log Jam Project. Second, and also contrary to Ninth Circuit precedent, the Forest Service failed to analyze the cumulative impacts of future projects in conjunction with the Log Jam Project. And third, the Forest Service made arbitrary decisions with respect to wolves and deer in approving the Log Jam Project under the Forest Plan. Turning first to the National Environmental Policy Act. Do you actually want to establish that it was arbitrary and capricious to think that the plan adequately protected the wolves and the deer? No, Your Honor. We do not seek to in any way challenge the terms of the Forest Plan. Rather, the Forest Service's decision-making pursuant to the Tongass Forest Plan. And starting with the National Environmental Policy Act, the Forest Service violated the act by failing to disclose and respond to concerns from the Alaska Department of Fish and Game regarding wolf mortality. The Ninth Circuit said in Earth Island Institute versus the Forest Service at 442 F. 3rd, 1172. Final environmental impact statements must respond explicitly and directly to conflicting views in order to satisfy NEPA's procedural requirements. Here, despite the Forest Service's claims to the contrary in its brief, the final environmental impact statement fails to disclose, let alone respond to expert biologists' concerns with the project, including leading wolf scientist, Dr. Person. The concerns articulated in the record by the Alaska... They did give extensive consideration to what the Alaska Department of Fish and Game represented to them, and the prior panel had looked at that and reached a conclusion. There's nothing new, and the only thing wrong with it, from your point of view, was the Forest Service didn't agree. Your Honor, actually, I disagree with you on two points. And the first point is, in the preliminary injunction appeal that was before the Ninth Circuit, the plaintiffs did not raise a claim regarding the Forest Service's disclosure obligations in the final environmental impact statement. The only issue that was raised was regarding the draft environmental impact statement. So, with respect to the final environmental impact statement and the inadequacies in that document, that was not raised previously before the District Court or the Ninth Circuit in the P.I. proceedings. And second of all, if you actually look through the record... There's a sentence in the memorandum disposition that we issued the last time the case came up. Second, the record establishes that the Forest Service did not discuss the potential impacts of log jam on wolves and discussed this issue extensively in the D.E.I.S., that's Draft Environmental Impact Statement, and F.E.I.S., that's Final Environmental Impact Statement. That's correct, Your Honor. And what the District Court had found during the preliminary injunction proceedings was any nondisclosure, and here the Forest Service did not disclose at all any of the concerns raised by the Draft Environmental Impact Statement, but said that that problem was remedied in the Final Environmental Impact Statement. We said that the draft was in error, but the Forest Service corrected its error in the Final Environmental Impact Statement. So, that seems like a sort of like a got you is what you're trying to say. If we want them to take a hard look, if we want them to continue to respond, what you're essentially, you know, saying that if there's something that they notice in the draft that they want to correct in the final, that's a got you. You can't do that. Actually, Your Honor, there's different requirements for the information that needs to be supplied in a Draft Environmental Impact Statement and what needs to be in a final. Are you saying, though, that they can't correct things in a final without having implications that you'll claim there's a problem? Absolutely not, Your Honor. You don't want people to correct problems? We absolutely want them to correct problems. That's the whole point of the National Environmental Policy Act process is disclosure and the opportunity for comment and if an agency never corrected problems, there would be no, there would be very little point to the National Environmental Policy Act process. The problem here is the Forest Service did not correct the problem. The Alaska Department of Fish and Game raised three very serious concerns with this project. They said wolf mortality is unsustainable in the project area and I would point the Court to excerpts of record 522 and 519. The Alaska Department of Fish and Game said road densities are too high and I would point the Court to excerpts of record 519 and 352 and the Alaska Department of Fish and Game said we cannot fix this problem by closing hunting and trapping in the area. The burden is on the Forest Service to reduce road density in the area and I would point the Court to 519 and 352. Now if you look at the body... Did the Alaska Department of Fish and Game view just one more thing that the government has to take account of and give a hard look to? Absolutely, Your Honor, and here they didn't give it a hard look. Let's take a look, if you look at the excerpts of record and the actual final environmental impact statement at excerpts of record 269, what the Forest Service said is two biologists with the Alaska Department of Fish and Game raised wolf mortality concerns. In reality, the state in its comments on the draft environmental impact statement raised these concerns at excerpts of record 352. After the comment period closed, the Forest Service and the Alaska Department of Fish and Game exchanged letters in which again the state raised wolf mortality concerns. This was a concern by the expert agency that the Forest Service did not inform the public about. Wait a minute, the Forest Service says here on 269 that it acknowledges that it received information from the state of Alaska that conflicts with the Forest Service's view. And that's my next point, Your Honor. What the Forest Service says is that it obtained harvest data and a wolf management report from the Forest Service that do not seem to support a wolf mortality concern, correct, in the final EIS at excerpts of record 269. And in reality what had happened is the Alaska Department of Fish and Game sent the Forest Service letters explaining you cannot rely on our recent harvest data. It's unreliable. We closed this area to hunting in 1999 and after that people stopped reporting hunting and trapping of wolves in that area. And they made a second point and let me give you the site to that because I think that's a really critical point. That's at excerpts of record 340, the letter from Alaska Department of Fish and Game that says that. But the state also said to the Forest Service, our harvest data, our hunting and trapping data does not account for the unlawful harvesting of wolves that occurs. There's a lot of illegal hunting and trapping of wolves and if you just look at our harvest data it does not account for that. Now you can look at the final environmental impact statement. You can look at the Forest Service's response to comments which is in the excerpts of record 297 to 300. Those concerns from the Alaska Department of Fish and Game are never disclosed to the public. So what are you saying that's new here that you didn't already say before the district court? Did you say all this before the district court? We said all this before the district court in our motion for summary judgment. During the preliminary injunction proceedings we did not raise any claims about the final environmental impact statement with respect to disclosure. So this is an entirely new claim that was raised at summary judgment. There's extensive evidence from the administrative record that shows the Alaska Department of Fish and Game raised these concerns to the Forest Service. Let me make it concrete to make sure I understand it.  The final environmental impact statement sufficiently discloses and addresses the statement from the Alaska Department of Fish and Game that their data is no good. The data they furnished to the Forest Service because they don't know how many wolves are illegally trapped and illegally hunted since naturally since it's a crime it wouldn't be reported to them. Exactly. Okay so that's what the wolf component of the wolf issue. There's one additional issue that the Alaska Department of Fish and Game raised that the Forest Service never addressed and the state said we cannot close. Was there data to show that that error would not be harmless that the illegal taking of wolves is so great as to completely change  Yes your honor there is and I would point you to the correspondence from Dr. Person who's the leading wolf scientist in the state and what he said is if you look at our harvest data that is reliable and on top of that you calculate what based on his research has indicated is the amount of unlawful hunting and trapping that takes place. There's a lot of unlawful hunting and trapping and well just like there's unlawful use of marijuana and unlawful speeding any law you can depend on there being unlawful instances of behavior and was he talking specifically about wolf trapping and did he give numbers? Yes he was talking specifically about wolf trapping. He did give numbers. He has a report that's in he knows because he's one of the only scientists who's actually done ground research and so he has set out he has various study sites and within those study sites he has found unlawful leg hold traps and other evidence of unlawful hunting and trapping so based on his on the ground research he's created a tool for estimating unlawful harvest on top of the reported harvest so he expressed in his correspondence with the Forest Service that using his using the reliable data from the state using his methodology which is the only methodology out there in the project area wolf mortality is unsustainable and that's and looked at that right they just didn't agree with his numbers I don't know what the Forest Service thought because they never disclosed to the public what Dr. Person said and they never responded why they could continue to rely on the state's data that the state said was unreliable there's nothing in the environmental impact statement that provides the Forest Service's rationale for going forward with the project despite being notified repeatedly by the state that there were problems with the data that the Forest Service was relying on now whether this changes the outcome or not for the National Environmental Policy Act what the Forest Service had to do at least was disclose this debate to the public they had to let the public know what the state had said they are the expert this expert witness that you're relying on was not part of the Forest Service right that's correct instead he was reporting his data to the public that's correct so it's not as though the Forest Service kept it secret the data is publicly available and actually if you look at the report it's available on the Alaska Department of Fish and Game website the first page of the report contains a disclaimer saying it's in the excerpts of record somewhere it's not the state says why are you asking us to rely on it I'm not asking you to rely on it I'm asking you to rely on the reliable data and the calculations from the actual biologists at the Alaska Department of Fish and Game are his calculations here yes yes they are they're in the excerpts of record at 519 and then another biologist relied on his work at excerpts of record 522 to to draw the same conclusion it's not secret it's secret in terms of the National Environmental Policy Act process you keep putting your argument in terms of the Forest Service not disclosing as though it's a secrecy case and that keeps confusing me I think your argument is that they did not give a hard look to the data because they didn't talk about this particular matter absolutely that's correct but they in addition to that though without even giving it a hard look anything from the public well they they did they hid this from the public how did they hide it if it's right here it's in it's in correspondence that the Forest Service received but they never the Forest Service never provided it from the public I thought he was reporting it to the public I excuse me if I if I didn't understand your question the Alaska Department of Fish making this a case of government secrecy and trickery of the public and it looks to me like that can't possibly be true the case has to be about whether the Forest Service adequately considered the matters that were put before and I don't understand either I may be misunderstanding and you know we get a lot of cases I can misunderstand and so if I am I want you to explain to me but I don't understand why it's a secrecy case your honor it's it's both and it's it's not a secrecy case it's a non-disclosure case and the reason that we're focusing I'm focusing on the disclosure issue as well as the hard look issue is because the National Environmental Policy Act is above all else a disclosure statute it's the obligation of the agency to actually disclose relevant information to the public when it's making a decision and the the Council on Environmental Quality Act Council on Environmental Quality regulations require the Forest Service to do this at 40 CFR section 1502.9 and the agency did not abide by that. 519 it doesn't look like a scientific report it looks like a letter to a friend it starts hi Marla sorry it has taken me so long but I've been out sick looks like a letter to a friend that's what you're relying on that they should give more attention to that is Dr. Pearson saying based on my research I calculate that wolf more mortality in this area is unsustainable and his report in which he relays lays out that information is in both the government's excerpts of record and in our supplemental excerpts of record so that's his summation of his research that he was asked for his opinion by the Forest Service and he provided it and that opinion nowhere is found in the final environmental impact statement nor does the Forest Service take a hard look at that issue you can look at the final environmental impact statement at excerpts of record 297, 298, 299, excuse me 267, 268, 299. It's the same thing thanks Boyd hi Marla it doesn't look like scientific reports at all it's just somebody writing to a friend those are the that's the correspondence in which the Forest Service in writing the draft environmental impact statement for the log jam project is there some scientific report in here that the Forest Service did not give adequate consideration to yes there is and I don't have the excerpts of record right at at my fingertips but I can give them to you on rebuttal and we can look at that because Dr. Pearson's report is in the excerpts of record in which he calculates both wolf mortality and raises these concerns with the state's data and how to account for unlawful hunting and trapping but again the point is clear and as the Ninth Circuit said in the Western Watersheds Project case at 620 F 3rd 1206 if an agency offers no meaningful response to serious and considered comments by experts that agency renders the procedural requirement meaningless an environmental impact statement and exercise and form over substance and your honors that is exactly what the Forest Service did here you have a little over two minutes do you want to reserve that I would like to thank you your honor thank you good morning again good morning again your honors I'm back I now have some reinforcements um so how are you going to do state your name and then tell us how you're going to divide time right John Smeltzer for the Forest Service I expect to take 15 minutes of the argument Ruth Tiger is here for intervener Viking Lumber she will have five minutes Tom Leonard is here with the intervener state of Alaska he could answer any questions if you have from the state 15 and 5 takes 20 so that's your time that's correct your honor absolutely let me start with the disclosure and the whole circumstance surrounding wolf mortality impacts and your honors the feis well let me start by saying first the principal concern that was raised to the previous panel was a supposed limitation in the deis and in the preliminary injunction phase the the tcs wasn't concerned with the feis and this court in looking at the deis said well look it was corrected in the feis so it's not a problem now they want to come back and say oh there's also a problem with the feis but there is a lot you can use english instead of abbreviations the final environmental impact statement as opposed to the draft your honor and if you look at the final uh environmental impact statement um in the excerpts of record from pages 267 through 269 they address the specific concerns that were raised by dr person and then again in the appendix to the excerpts of record at pages 297 through i believe it's 300 there is an extensive discussion of the concerns that were raised by the states the opinion the opinion of the state biologists and also the issue behind that opinion the particular facts that matter um uh to to the issue um tcs has argued that there were three issues that weren't addressed with dr person as he was saying look we don't know how many wolves are taken there we know what's reported to the state but we assume people commit crimes and the only way to protect the wolves is keep people out all together and roads won't keep people out all together people get in is that about right well yes i mean in somewhat of a nutshell but there i mean the concern is the concern about access for hunters right and of course the concern is that when people come in they have the ability then to trap and to hunt where they wouldn't otherwise if there are roads it's the same concern for legal and for illegal hunting and when we mean illegal we just mean non-reported that concern was addressed in the feis because every time they talk about the road density and in the rest of the project record they acknowledge it's an issue with respect to both the reported lawful taking and the unlawful taking with respect to the unlawful non-reported in the wildlife report that was in the project record the forest service also said look if you take the data that's actually been reported to the state and in which the state has relied and you double it as dr person has suggested you should do because there may be an equal rate of unlawful hunting that the the rate of actual hunting in this area in the project area is still doesn't show unsustainable harvest and again the question is do you take the modeling and dr person did a study where he did a model and he uh equated um positively correlated wolf takes with road density and then he assumed based on that information that there would be a certain amount of take in a certain amount of area based on the amount of road density there is in that area and so what the forest service is saying look we understand the model and they say it at excerpts of record 267 they we acknowledge the road density calculations done by dr person would indicate the possibility of an unsustainable wolf harvest in the wildlife analysis area however the actual reported data of this wildlife analysis area does not indicate a harvest level that would be unsustainable and then in the wildlife report they explain that's true even if it's double and they also go on and they quote extensively from not only the the data they provide the data in the uh feis but they quote from the state's own wildlife management report and of course the state uses the data for the reason of managing the wildlife and the 2006 report that was presented to the forest service in addition to the other stuff that was provided by the state of alaska and i'll quote it says we believe the unit two wolf population has remained stable during this reporting period the number of unit two trappers who successfully catch wolves each year is declining perhaps mirroring the slow declining local human population and an aging trapper pool and then it goes on but what we have is the official state data not correlating the model okay and that's fully disclosed in the feis the other thing the court needs to understand is this is a pre-existing problem it's a problem that that because the the forest service chose this area as we explained in the brief because it was an already roaded area and that would minimize impacts and what the the debate that's going on here in the record is between the wildlife biologist and the forest service with respect to the data as to what is the the harm from the pre-existing road system it's not specifically a question about the project because the project record is clear that the project's not going to significantly increase the road density it's a question about the pre-existing road density and is that an issue and that's important because what the forest service ultimately determined was yes there will be a slight increase in road density but we're not going to have a change to the status quo that's going to change the problem here even if it is a problem right the forest service acknowledged that yes these these concerns have been brought to us yes we understand these concerns but we're not changing that that situation there's already these roads here and your honor i would like to draw your attention to dr person's scientific analysis which is in the record um and uh not just the letters and let's this is what the supplemental excerpts of records we also have part of it in the excerpt in our supplemental but this is um log jam or tcs's uh supplemental excerpts and i'm referring to page 17 of the supplemental excerpts and the bottom paragraph begins and i'll quote road density is an important predictor of harvest and this is where he's talking about correlating road density to harvest then he goes on nonetheless that relation deteriorated at road densities greater than 0.9 kilometers per square kilometer which probably represented a threshold beyond which further increases in road density had little detectable effect on rates of harvest i'm reading persons here and he says it makes no difference once you go above that level that's correct what dr person is saying is look this is our data this is our density with harvest but the correlation falls apart once you get above a threshold the road density in the project level was already well above that threshold we reported that in the deis we reported it in the feis and we reported the state's concerns but ultimately i think you should also look at uh dr person's conclusion of this study and that's on page uh hard to read 18 of the supplemental excerpts and it's the final line of the penultimate paragraph and he says therefore we conclude that a combination of conservative harvest regulations and large roadless reserves likely are the most effective measure for conserving wolves or risks from human cause mortality are high let me talk about the first part of that conservative harvest regulations one of the things they say we didn't address was this thing the point about you can't close the project area in the feis we we mentioned that we mentioned their comment in the in the appendix you can't close the harvest area but you can close the game management unit and the state hasn't done it since 1999 and dr person says well if you've got a problem you can have a conservative harvest regulation and you can't address it and that's what we said in the feis there are closures that could work what's also said by dr person is what really matters is maintaining the old growth reserves to provide the habitat the roadless habitat that the wolves need what's in the briefs is a concern that was raised by the state about a lack of connectivity between the two of these old growth reserves was worked out between the forest service and the state after the uh rod was uh announced and the state no longer has any concern about the project related impacts and again this is all about the project there may yet be a concern overall about wolf sustainability or mortality based on road densities in this area but this is about the project the state is satisfied with the project the project is not changing the status quo according to their own experts um so that the bottom line is you said you took a hard look we took a hard look we definitely took a hard look we took in the reply brief the appellants argue that they show that the forest service acted arbitrarily capriciously and contrary to law and that this court should issue an injunction do you agree or why or why not um i disagree because we didn't violate the law your honor we took a hard look under nipa and we complied with all aspects of the forest plan if there are other questions about non-compliance with the statutes i'd be happy to address them miss tiger was going to address the injunction issues all right thank you thank you ruth tiger for viking lunger company your honors good morning morning uh in answer to your last question judge callahan we certainly do the plaintiffs have in any way demonstrated entitled entitlement to a permanent injunction in this case first and foremost of course we agree with federal appellees that the district court correctly denied the appellant's motion for summary judgment and this court should affirm on the merits you only get to the question of injunctive relief of course if you determine that the the appellee the clock's not going mine isn't anyway no it's fine there we go you only get to the question of injunctive relief of course if you make a determination in the first instance um that the appellants succeed on the merits and we submit that they do not but assuming that they have convinced you um they have to meet the second prong of the test which means they have to meet all four elements of the requirements for injunctive relief and they simply cannot do that in this case and principally because the last two elements for injunctive relief the balance of harms and the public interest do not fall in favor of the appellants as articulated in the declarations included in the record in this case if the logjam project is enjoined this will lead while not immediately but will lead to the closure of Viking Lumber Company as an ongoing business in southeast Alaska I don't want to go through things that are already in the record other than to say that this company provides jobs this company provides community infrastructure and the loss of this company to Alaska to southeast Alaska in particular not only would be to the detriment of these individual peoples but people but would also be contrary to the public interest as expressed by Congress in the Tongass Timber Reform Act we recognize of course that NEPA expresses Congress's interest in compliance with environmental law Tongass Timber Reform Act also expresses Congress's interest in the continuing maintenance of the timber industry in southeast Alaska in their reply brief the appellants seek to convince this court that you need not reach the question of injunction and that if you find for them on the merits of any of their claims that they automatically get the project thrown out and that is contrary to the precedent both of this court and the Supreme Court that the appellants need to meet their obligation to demonstrate entitlement to an injunction and finally the appellants contrary to the requirements of the Tongass Timber Reform Act claim that they're sympathetic to the economic realities that are faced by Viking yet they ask the court to ignore those concerns we have a lot of cases in environmental law where we I don't think we've called it that in the cases but we've applied what environmentalists like to call the precautionary principle if we're not sure that there's a hard enough look and we're not sure that the government has proved that the project can go ahead with no harm then it must be enjoined regardless of how destructive that is to humans who live in the area I don't think is that dead under the winter case I think that is dead under winter and and additionally under Monsanto the court made very clear that you don't put a thumb on the scales the environment does not trump the concern to people and in this case in particular we're not simply talking about the loss of jobs we're talking about the closure of essentially the last remaining mid-sized sawmill in southeast Alaska Congress in the Tongass Timber Reform Act in particular expressly stated that that is contrary to the public interest so even if I'm agreeing with you that that it's dead I don't believe it it survives after winter but even if environmental harm is established and it is irreparable there is irreparable harm that would occur in this case and that in terms of the shutdown of the Viking Mill and that needs to be balanced should you should you get to that which we don't think you ever do so ultimately in in weighing those harms and in weighing where the public interest lies the appellants have the burden they cannot meet the burden and the court should it even get to the question should deny the request for injunctive relief thank you for your argument thank you this matter does not yet stand submitted there's a short rebuttal I think I don't think it was I don't think that yeah there we go you have about two minutes thank you your honor um so first judge judge Kleinfeld just to finish our discussion as you heard from counsel from the Forest Service Dr. Pearson's study is in the plaintiff's excerpts of record supplemental excerpts of record pages 13 to 18 and in the defendant's supplemental excerpts of record at 270 that was a study about radio collared wolves and so he was well aware when his wolves were taken unlawfully and unreported because they were wearing radio collars so he disappeared from a study area you heard a lot of information from the Forest Services Council about why the Forest Service believed it took a hard look here but nowhere can they point to a site within the record where the agency explains why it can rely on data that the Alaska Department of Fish and Game said is unreliable all of the Forest Services calculations use recent harvest data that Alaska Department of Fish and Wildlife said this discussion of Dr. Pearson's study at 267 through 269 adequate your honor it's adequate but I would caution the use of his findings he said the correlation between increased road densities and increased hunting and trapping falls apart at some point and that's correct but that study nevertheless finds and I would point the court to plaintiffs supplemental excerpts of record 13 that roads are incredibly harmful for wolves so the fact that you're not going to see this you know doubling of wolf hunting and area but what that all sounds like is you disagree with their conclusion not that they didn't consider it and that's not in fact what happened here what the agency never said to the public is why if wolf mortality is a concern in the project area it can continue to increase road densities when its own forest plan at excerpts of record 524 says that all roads whether they're open or closed contribute to wolf mortality the forest service simply never provides that explanation to the public it never says when wolf mortality is a concern we have to grapple with road densities we're going to continue to increase road densities here that's one of the three things where we can do to manage wolf mortality and we're going to make the problem worse the agency never explains why it can continue to do that all right your time has expired this matter will now stand submitted in this court is in recess all rise this court for this session stands adjourned
judges: B Fletcher, Kleinfeld, Callahan, Cjj